# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| David Jannetta; Steven Hogy; Merlin Adolphson; and Kenneth Daywitt, | Case No. 19-CV-2622 (ECT/TNL) |
| Plaintiffs, | |
| v. | **REPORT AND RECOMMENDATION** |
| Minnesota Department of Human Services; Ms. Harpstead, DBS Commissioner; Marshall Smith; Nancy Johnston; Nicole Elsen; Jim Berg; Jannine Hebert; MSOP Media Review Committee Personnel Jane Doe 1-5 and John Doe 1-5; Jaime Houk, MSOP Clinical Program Manager and Media Review Committee Chairwoman; and Jessica Geil, MSOP Legal Director, in their individual and official capacities, | |
| Defendants. | |

David Jannetta, Steven Hogy, Merlin Adolphson, and Kenneth Daywitt, plaintiffs pro se.

Aaron Winter, Minnesota Attorney General's Office, for defendants.

\*\*\*

Plaintiffs David Jannetta, Steven Hogy, Merlin Adolphson, and Kenneth Daywitt challenge, on constitutional grounds, a policy of the Minnesota Sex Offender Program ("MSOP") prohibiting MSOP clients from possessing or viewing videos that are either "unrated" or "not rated" by the Motion Picture Association of America ("MPAA"). Plaintiffs also challenge a recent discontinuation of cable television at MSOP, arguing

1

that the discontinuation amounts to a denial of their constitutional rights.  This matter is before the Court on defendants' motion to dismiss pursuant to Rule 12 of the Federal Rules of Civil Procedure.  *See* ECF No. 16.  After review, this Court recommends that the motion to dismiss be granted with respect to all claims except the challenges to the unrated-video policy under the First and Fourth Amendments brought against defendants in their official capacities as agents of the State of Minnesota.

## I.  BACKGROUND

Plaintiffs are each "clients" — that is, indefinite civil detainees — of MSOP.  *See* Compl. ¶¶ 8-11 [ECF No. 1].  As clients of MSOP, plaintiffs are subject to MSOP Policy 420-5230 (hereinafter "the Policy"), which "limits client access to certain media to further the therapeutic environment and maintain the safety and security of the facility for clients, staff and the public."  *See* Declaration of Aaron Winter ("Winter Decl.") Ex. 1 at 2 [ECF No. 19-1 at 2].  The Policy prohibits MSOP clients from possessing many categories of media content, such as (for example) obscene material, pornographic material, and material displaying scenes or depictions of sexual violence.  *Id*. at 2-3.  Among the categories of media prohibited by the Policy are videos that are either "unrated" or "not rated" by the MPAA, except for "not rated" videos that "are educational or . . . are related to physical fitness, music concerts, spirituality or relaxation/mindfulness, and made for television films . . . ."  *Id*. at 3-4.

Plaintiffs challenge the Policy's prohibition on unrated and not rated videos.  Each of the plaintiffs alleges that he has an interest in media with subjects involving lesbian, gay, transsexual, and bisexual ("LGBT") content, themes, or focus.  *See* Compl. ¶¶ 8-11.

Plaintiffs allege that many videos with specific LGBT focuses are not rated by the MPAA because those videos "are done on very small budgets and the cost of using the MPAA is very high . . . ."  Compl. ¶ 28.  Because they are not rated by the MPAA, these LGBT videos are prohibited under the Policy.  By contrast, comparable videos with heterosexual focuses are, according to the plaintiffs, more likely to be rated by the MPAA and therefore permitted under the Policy (unless the videos are barred by another aspect of the Policy).

Plaintiffs bring three claims pursuant to 42 U.S.C. § 1983 related to the Policy. First, plaintiffs contend that the Policy violates the First Amendment insofar as it prohibits them from possessing and viewing media that has not been rated by the MPAA. Second, plaintiffs contend that MSOP officials have violated their Fourth Amendment rights by seizing media deemed to violate the relevant aspects of the Policy.[1]  Third, plaintiffs allege that the Policy has a disparate impact upon individuals who are LGBT or who otherwise have an interest in LGBT media and therefore violates their equal-protection rights under the Fourteenth Amendment.

Plaintiffs also bring a set of claims unrelated to the Policy.  MSOP recently discontinued its subscription to cable television and informed clients that, for cable television to be returned, at least 85 percent of the MSOP population would be required to agree to pay about $50 every three months towards the subscription cost.  *See* Compl.

---

[1] This illegal-seizure claim is also brought under the Minnesota constitution, though plaintiffs are not clear how this state-law claim differs in scope from the federal constitutional claim.  *See* Compl. ¶¶ 54-57.

¶¶ 36-37.  Plaintiffs allege that the discontinuation of cable television has a disparate impact upon LGBT clients similar to that of the Policy, because content on cable television is more likely to have LGBT themes than content carried through an antenna. Plaintiffs also allege that the loss of access to cable television amounts to a violation of their First Amendment rights.

## II.  ANALYSIS

Defendants have moved to dismiss the complaint pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[2]  *See* ECF No. 16.  The Rule 12(b)(1) component of the motion is largely unopposed — plaintiffs concede that, due to sovereign immunity, the Minnesota Department of Human Services is not an appropriate defendant to this action, while the other defendants cannot be held liable for monetary damages in their official capacities as agents of a state.  *See* Pl.'s Mem. in Opp. at 14 [ECF No. 26]; *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974).  Accordingly, this aspect of defendants' motion to dismiss should be granted, the Minnesota Department of Human Services should be dismissed without prejudice from this action, and all claims for monetary relief brought against defendants in their official capacities should likewise be dismissed without prejudice on the basis of sovereign immunity.

---

[2] For their part, plaintiffs have filed a motion in opposition to the motion to dismiss.  *See* ECF No. 24.  No such motion is necessary.  Plaintiffs are entitled to respond to the motion to dismiss under this District's Local Rules, *see* D. Minn. L.R. 7.1(c), and this Court has fully considered the arguments raised in that response.  Accordingly, it is recommended that the motion in opposition be denied as moot.

This leaves, broadly speaking, two sets of claims remaining: (1) claims for prospective injunctive relief (i.e., non-monetary relief) brought against the remaining defendants in their official capacities; and (2) claims for monetary damages brought against the remaining defendants in their individual capacities. Defendants seek dismissal of both sets of claims pursuant to Rule 12(b)(6).

Under Rule 12(b)(6), a court must accept as true a complaint's factual allegations and draw all reasonable inferences in the plaintiffs' favor. *See Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008). Although plaintiffs' factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must also "state a claim to relief that is plausible on its face." *Id*. at 570. In assessing a claim's plausibility, the Court may disregard any allegation that is conclusory. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding that conclusory allegations "are not entitled to the assumption of truth.").

This Court concludes that plaintiffs have not pleaded a viable equal-protection claim or a viable claim related to the discontinuation of cable television at MSOP. Accordingly, it is recommended that those claims be dismissed with prejudice. By contrast, this Court concludes that the plaintiffs have pleaded a viable claim for injunctive relief under the First and Fourth Amendments regarding denial of access to "unrated" and "not rated" videos. It is therefore recommended that this claim go forward against the defendants in their official capacities. But because a reasonable official could not have known that the Policy's prohibition on unrated and not rated videos might have been

unlawful, defendants are entitled to qualified immunity for any claims brought against them in their individual capacities for monetary relief.

### A. Official Capacity Claims

As just explained above, defendants argue — and plaintiffs concede as true — that plaintiffs cannot seek monetary relief from the defendants in their official capacities as agents of the State of Minnesota.  Those claims have therefore been recommended for dismissal without prejudice on jurisdictional grounds.  Plaintiffs may, however, seek prospective injunctive relief from federal constitutional violations against state officials in their official capacities.  *See Ex parte Young*, 209 U.S. 123 (1908).  Accordingly, this Court must proceed to the merits of plaintiffs' complaint and determine whether a viable claim for relief has been pleaded against the defendants in their official capacities.  This Court will first examine the claims brought by plaintiffs related to the Policy and will then examine the claims brought by plaintiffs related to the cessation of access to cable television.

### 1. Policy Claims

### a. Equal Protection

The Policy prohibits MSOP clients from possessing or viewing videos that are "unrated" or "not rated"[3] by the MPAA.  Clients allege that, *ceterus paribus*, videos with LGBT content are less likely to be rated by the MPAA and that LGBT individuals are

---

[3] The distinction between "unrated" and "not rated" videos is not clear from the record before this Court, though the two categories are separately prohibited by the Policy.  *See* Winter Decl. Ex. 1 at 3.

6

more likely than non-LGBT individuals to be interested in videos with LGBT content.

Accordingly, conclude plaintiffs, the Policy has a disparate impact on LGBT clients and

thereby violates the equal protection clause of the Fourteenth Amendment.

The problem for plaintiffs "is that disparate impact is not sufficient to show a

constitutional violation.  The Equal Protection Clause of the Fourteenth Amendment is

not violated absent invidious or discriminatory purpose . . . ."  *United States v. Farmer*,

73 F.3d 836, 841 (8th Cir. 1996).  Plaintiffs do not contend that MSOP officials

purposefully set out while drafting the Policy to limit client access to LGBT materials, or

that MSOP officials were motivated in drafting the Policy by animus against LGBT

clients.  Instead, plaintiffs' claim rests entirely upon a disparate-impact theory — that due

to the economic structure of LGBT media, videos with LGBT content are less likely to be

rated by the MPAA and therefore less likely to be permitted under the Policy.  Whatever

the truth of this allegation, it is insufficient to state a claim for relief under the equal

protection clause.

Faced with clear case law undercutting their disparate-impact theory of recovery,

plaintiffs attempt to repackage their equal-protection claim in their briefing.  According

to plaintiffs, even if the *initial* implementation of the Policy was not purposefully

discriminatory, MSOP officials have since been put on notice (through client grievances)

of the Policy's disparate impact on LGBT individuals.  Nevertheless, MSOP officials

continue to enforce the Policy without altering the restriction on unrated and not rated

content.  This continued enforcement, plaintiffs argue, reflects purposeful intent to

discriminate, even if the motives in drafting the Policy were not discriminatory.

"Discriminatory intent, however, 'implies more than intent as volition or intent as awareness of consequences.'" *SECSYS, LLC v. Vigil*, 666 F.3d 678, 685 (10th Cir. 2012) (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). Rather, discriminatory intent requires "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of the law's differential treatment of a particular class of persons." *Id.* (quotation omitted). Nothing in the complaint (or, for that matter, the briefing) so much as gestures at such a discriminatory *intent* on the part of MSOP officials in continuing to enforce the Policy. At most, defendants can be said — assuming, as this Court must, that the allegations of plaintiffs are true — that the continued enforcement of the Policy reflected an indifference to the potential disparate impact on LGBT clients. But as explained above, plaintiffs cannot succeed without plausible allegations of discriminatory purpose, not mere indifference. Plaintiffs' equal-protection claim should be dismissed.

### b. First Amendment

Plaintiffs next allege that the Policy's prohibition on unrated and not rated videos violates their First Amendment rights. Defendants offer two arguments in response: (1) that the restrictions set forth in the Policy do not implicate First Amendment interests at all, and (2) that, even if the restrictions do implicate First Amendment interests, the restrictions are reasonably related to valid institutional purposes and therefore permissible.

The Court begins with defendants' first argument. "Although there has been little reason outside the prisoner civil rights context for courts to consider a 'right to view

television,' the law is established that the content of television programming is, in fact, speech." *Ivey v. Johnston*, No. 18-CV-1429 (PAM/DTS), 2019 WL 3334346, at *6-7 (D. Minn. July 24, 2019); *accord Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981).  Much the same can be said for other forms of visual media, including videos. *See Stone v. Jesson*, No. 11-CV-0951 (WMW/HB), 2019 WL 7546630, at *4-5 (D. Minn. Dec. 3, 2019).  And, of course, the First Amendment guarantees the right not only to produce protected content, but to view protected content as well.  *See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("[W]here a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both.").

Defendants cite several cases in support of their argument that consuming visual media is not a protected activity, but those case are largely distinguishable.  For example, the Eighth Circuit and several other courts have concluded that civil detainees do not have a protected liberty or property interest in possessing televisions or other electronics, and therefore are not entitled to procedural protections before those items are removed from their possession.  *See, e.g.*, *Hollie v. Ludeman*, 450 Fed. App'x 555 (8th Cir. 2012) (per curiam).  But this conclusion is not inconsistent with the conclusion that video content — and, by extension, the watching of content in videos — is protected activity under the First Amendment.  Prisons and other secure facilities are under no affirmative obligation to provide televisions to detainees.  Should facility officials provide access to a television, they need not extend procedural protections to prisoners each time that their access to the television might be restricted in the future.  *See, e.g.*, *Mitchell v. Caruso*,

No. 1:05-CV-0728, 2007 WL 603399, at *7-8 (W.D. Mich. Feb. 22, 2007). To say that prison officials need not conduct a hearing each time that television access is restricted, however, is different than to say that watching certain types of television or other visual media content is not protected activity under the First Amendment.

That a policy differentiating viewing based on content, here between unrated and not rated movies from those rated by the MPAA, implicates constitutionally protected activity merely begins, not ends, the inquiry into the validity of plaintiffs' First Amendment claim. In the prison context, the Supreme Court has long recognized that although "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84 (1987), prison officials may lawfully take action that would otherwise impinge upon an inmate's constitutionally protected activity so long as the action is "reasonably related to legitimate penological interests," *id*. at 85. "*Turner* identified four factors relevant to assessing the reasonableness of the [prison] regulation: (1) 'a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it'; (2) 'alternative means of exercising the right that remain open to prison inmates'; (3) 'the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally'; and (4) 'the absence of ready alternatives.'" *Stone*, 2019 WL 7546630, at *4 (quoting *Turner*, 482 U.S. at 89-90).

MSOP clients are not prisoners, and MSOP officials therefore do not have "legitimate *penological* interests." *Turner*, 482 U.S. at 85 (emphasis added). MSOP

officials do, though, have "legitimate therapeutic or institutional interests," *Ivey v. Mooney*, No. 05-2666 (JRT/FLN), 2008 WL 4527792, at *10 (D. Minn. Sept. 30, 2008), and — just as in the prison setting — those legitimate interests sometimes conflict with the rights that clients would otherwise possess if they were not lawfully detained by the state. Accordingly, courts of this District have long applied a modified version of the *Turner* test to claims of constitutional violations arising from the civil-detention setting. Under this "modified *Turner* approach," courts must consider

> (1) whether the MSOP policy at issue bears a rational relationship to legitimate institutional and therapeutic interests; (2) whether the MSOP client has alternative means of exercising the First Amendment right at issue; (3) whether and to what degree accommodation of the right would impact the institution, resources, staff, and other clients; and (4) whether simple and cost-effective alternatives exist that would meet MSOP's objectives.

*Stone*, 2019 WL 7546630, at *5.

Defendants urge the Court to apply the modified *Turner* approach at this time and dismiss the First Amendment claim related to the Policy pursuant to Rule 12(b)(6). But "[a] determination under *Turner* of whether First Amendment rights were violated in the civil commitment context 'is a fact-intensive universe.'" *Wagner v. Harpstead*, No. 18-CV-3429 (MJD/HB), 2019 WL 6918360, at *3 (D. Minn. Nov. 12, 2019) (quoting *Ivey*, 2019 WL 3334346, at *6). This Court is not the first of this District to recognize "that, on a motion to dismiss, there is no record on which to conduct a modified-*Turner* analysis," making such an analysis difficult (if not impossible) at this stage of the litigation. *Id.* (citing *Stone v. Jesson*, No. 11-CV-0951 (WMW/HB), 2017 WL 1050393,

at *4 (D. Minn. Mar. 17, 2017); and *Ivey v. Johnston*, No. 18-CV-1429 (PAM/DTS), 2019 WL 3987583, at *2 (D. Minn. Aug. 23, 2019) (adopting Report and Recommendation and concluding that "[f]urther analysis of the First Amendment implications of [the MSOP regulation] is necessary, but inappropriate at the motion-to-dismiss stage with the limited factual record before the Court.")); *accord Manos v. Federal Bureau of Prisons*, No. 18-CV-0427 (PJS/HB), 2020 WL 589441, at *5 (D. Minn. Jan. 14, 2020); *Meyer v. Stacken*, No. 17-CV-1761 (ADM/KMM), 2019 WL 4675353, at *4 (D. Minn. July 25, 2019).

This is not to say that defendants (or the Court) are powerless under Rule 12 in the face of an untenable claim of constitutional violations brought by civil detainees. First, the claim must allege that there has, in fact, been an infringement of a constitutionally protected interest. Where a constitutionally protected interest is not at stake, a modified *Turner* analysis is unnecessary, and the claim for relief under § 1983 may be dismissed. Second, the claim of infringement of a constitutionally protected interests must be plausible in light of the modified *Turner* factors. *Twombly*, 550 U.S. at 555; *Wickner v. Rose*, No. 17-CV-1214 (DWF/DTS), 2019 WL 3976203, at *5 ("[T]o properly state an individual claim, [a litigant] must plead factual matters specific to him that, if true, would state a claim under the modified *Turner* factors."). Accordingly, a claim may be dismissed under Rule 12(b)(6) where the legitimate therapeutic or institutional interest of the defendant is obvious from the face of the complaint and the claimant has not pleaded facts that, if true, would establish a plausible basis for relief under the modified *Turner* approach.

12

This Court has little trouble concluding that there are legitimate therapeutic and institutional interests at issue for MSOP defendants in restricting clients' access to media that would otherwise be protected by the First Amendment. "It is well-established that '[t]he rehabilitation of sex offenders and institutional security of MSOP are legitimate government interests under *Turner*.'" *Stone*, 2019 WL 7546630, at * 5 (quoting *Banks v. Jesson*, No. 11-CV-1706 (SRN/LIB), 2017 WL 1901408, at *8 (D. Minn. May 8, 2017)). Uninhibited access to media would both hinder the proper therapeutic purposes of MSOP detention and potentially endanger MSOP officials. *See* Winter Decl. Ex. 1 at 2 ("The Minnesota Sex Offender Program (MSOP) limits client access to certain media to further the therapeutic environment and maintain the safety and security of the facility for clients, staff and the public."). Moreover, plaintiffs themselves seem to recognize that an item-by-item review of every picture, book, audio recording, and video recording places unrealistic demands upon MSOP resources. *See* Pl.'s Mem. in Opp. at 10. Some categorization of prohibited materials is undoubtedly necessary.

But the modified *Turner* analysis in this matter is not so obvious from the face of the pleading alone that this Court can conclude that plaintiffs' First Amendment claim is not viable. To begin, it is not yet clear that the plaintiffs have an "alternative means of exercising the First Amendment right at issue." *Stone*, 2019 WL 7546630, at *5. To be sure, the First Amendment "right in question must be viewed sensibly and expansively." *Thornburgh v. Abbott*, 490 U.S. 401, 417 (1989) (quotation omitted). That detainees are prohibited from watching specific videos is not rendered unlawful under the *Turner* (or modified *Turner*) approach simply because the detainees have no other means by which

to observe the content in those videos. *Id.* But plaintiffs allege that the ban on unrated and not rated videos results in a broader curtailment of visual media aimed at LGBT individuals. *See* Compl. ¶¶ 28-29. Accepting that allegation as true (as this Court must) for purposes of the motion to dismiss, the contention that plaintiffs have an "alternative means of exercising the First Amendment right at issue" would benefit from further factual development. *Stone*, 2019 WL 7546630, at *5.

Nor is it obvious that no simple and cost-effective alternative to the Policy exists. "Unrated" and "not rated" videos are not the only category of media prohibited by the Policy. For example, videos rated "R" by the MPAA are not automatically eligible for client access; instead, R-rated videos must be reviewed by MSOP staff before being placed on an approved list of media. *See* Winter Decl. Ex. 1 at 4. To minimize staff demands, each client may submit only one R-rated video (or other media eligible for review) for approval by MSOP officials each month. *Id.* This screening undoubtedly places a burden upon MSOP officials, but a burden that those officials have already opted to undertake under the Policy. Unrated and not rated videos, however, are not eligible for similar review. *Id.* At first approximation, expanding eligibility for review to unrated and not rated videos would not necessarily result in complex and expensive additional burdens on MSOP officials under the Policy[4]; in either case, clients may submit no more than one video for review each month.

_____

[4] The Court in *Stone* (on summary-judgment review) considered evidence that one reason for the blanket restriction on "unrated" and "not rated" media was that MSOP clients had previously ordered "unrated" or "not rated" box sets of television programs and that each request for review of those box sets required review of many hours of material. *See*

None of which is to suggest that the challenged aspects of the Policy would necessarily fail under a modified *Turner* analysis. But factual issues regarding the resolution of those factors remain unresolved, strongly suggesting that disposition of the First Amendment claim based on review of the pleading alone would be inappropriate. A more-developed record is necessary to review properly plaintiffs' First Amendment claim under the modified *Turner* approach. Accordingly, it is recommended that defendants' motion to dismiss the First Amendment claim regarding the Policy, as brought against the defendants in their official capacities, be denied.

### c. *Fourth Amendment*[5]

Plaintiffs next allege that media prohibited by the Policy is subject to seizure by MSOP officials, in violation of clients' Fourth Amendment right against unreasonable seizures. Although brought under a different constitutional provision, the Fourth

---

*Stone*, 2019 WL 7546630, at *7. But the Policy specifically prohibits box sets of television programs that are unrated, not rated, or rated TV-MA, separate and apart from the Policy's more general prohibition on unrated and not rated videos. *See* Winter Decl. at 3-4. (No challenge to the Policy's prohibition on not rated and unrated box sets has been pleaded, and therefore that aspect of the Policy is not properly before the Court in this proceeding.) It is not obvious that defendants can justify a broad restriction on unrated and not rated videos by pointing to a category of media that would remain prohibited even if the challenged restriction were removed.

[5] Plaintiffs also bring what appears to be an identical illegal-seizure claim under the Minnesota Constitution. It is doubtful that a private right of action exists at all under the Minnesota constitution for illegal-seizure claims. *See Mlnarik v. City of Minnetrista*, No. A09-0910, 2010 WL 346402, at *1 (Minn. Ct. App. Feb. 2, 2010). Even assuming that a private right of action does exist, however, "the Eleventh Amendment bars our court from ordering state officials to conform their conduct to state law." *Greene v. Dayton*, 806 F.3d 1146, 1149 (8th Cir. 2016). This state-law claim must be dismissed without prejudice on sovereign-immunity grounds.

Amendment claim is essentially a restatement of the First Amendment claim, as the parties appear to recognize.[6]  If defendants may, consistent with the First Amendment, restrict plaintiffs from possessing unrated and not rated videos under the Policy, then the seizure of unrated and not rated videos possessed by MSOP clients in violation of the Policy is reasonable.  *See, e.g.*, *Wickner v. Rose*, No. 12-CV-1397 (DWF/LIB), 2016 WL 6915508, at *9 (D. Minn. Oct. 19, 2016).  By contrast, if the limitations on access to unrated and not rated videos set forth in the Policy are unlawful, then the seizure of items in furtherance of the unlawful Policy is similarly unlawful.

This Court has already recommended above that the First Amendment claims related to the Policy go forward against the defendants in their official capacities as agents of the State of Minnesota.  Because the Fourth Amendment claim related to the Policy turns entirely upon the viability of the First Amendment claim, this Court similarly recommends that the Fourth Amendment claim brought under § 1983 go forward as well.[7]

### 2.  Cable Television Claims

Along with their claims against the Policy, plaintiffs also challenge the recent cancellation of cable television service at MSOP on equal-protection and First

---

[6] Plaintiffs have not brought a Fourth Amendment claim related to the unlawful *search* for media banned by the Policy, only the *seizure* of such media.  Nor have plaintiffs have brought a due-process claim related to the seizure of media deemed contraband — that is, plaintiffs have not alleged that they are entitled to further procedural protections before media may be restricted and seized under the Policy.

[7] That said, plaintiffs have offered no reason to believe that the illegal-seizure claim provides a basis for relief or remedy broader than the First Amendment claim.

16

Amendment grounds. Plaintiffs' cable-television claims mirror those raised with respect to the Policy. First, with respect to equal protection, content on cable television is (plaintiffs allege) more likely to reflect LGBT themes than television programming viewable with an antenna, and therefore the discontinuation of cable service has a disparate impact on LGBT clients. This Court has already explained above that this disparate-impact theory is insufficient to state a viable claim for relief under the equal protection clause. *See Farmer*, 73 F.3d at 841. Thus, plaintiffs' equal-protection claim regarding cable television fails for much the same reason as their equal-protection claim regarding the Policy.

Second, plaintiffs allege that the discontinuation of cable television amounts to a violation of their First Amendment rights. The claim is not compelling. Unlike the claim regarding the Policy, plaintiffs do not allege that they have been denied access to cable television. They allege only that MSOP has required clients to bear the cost. *See* Compl. ¶ 37. But there is no reason to believe that the First Amendment requires subsidization of cable television either by MSOP itself or by MSOP clients who might be unwilling to pay for the service. Moreover, plaintiffs themselves cite in their complaint a valid institutional purpose for MSOP's discontinuation of cable television — the cost. *Id.* This institutional purpose, apparent from the face of the complaint, is consistent with the modified *Turner* factors discussed above with respect to the Policy claims. Finally, plaintiffs do not allege that the content no longer available due to the discontinuation of cable television service has been prohibited to them; rather, this content remains available, albeit through other means, so long as it is not otherwise barred by the Policy.

17

*Cf. Pell v. Procunier*, 417 U.S. 817, 823-24 (1974) (considering existence of alternative means of exercising First Amendment rights as legitimate factor in determining whether prison regulation violates constitution).

Plaintiffs' claims that their constitutional rights were violated when cable television was discontinued at MSOP are not viable. Those claims should be dismissed.

### B. Individual Capacity Claims

Only two of the claims brought against defendants in their official capacities have been recommended to go forward: the claims under the First and Fourth Amendment related to the Policy. This Court has concluded that plaintiffs have failed to state a viable claim for relief in any other respect. The above analysis regarding the non-viable official-capacity claims applies equally to the same claims brought against defendants in their individual capacities. Plaintiffs simply have not plausibly alleged that their equal-protection rights were violated or that the discontinuation of cable television at MSOP amounts to a constitutional violation. Those claims may therefore be dismissed against the defendants in their individual capacities on the same grounds.

By contrast, this Court has recommended that the First and Fourth Amendment claims related to the Policy go forward against the defendants in their official capacities. A defense to those claims, however, remains available to defendants in their individual capacities that is not available to them in their official capacities: qualified immunity. "When a defendant asserts a defense of qualified immunity, a plaintiff must show that the facts taken in the light most favorable to him establish (1) that the defendant violated his constitutional right and (2) that the right was clearly established at the time of the

incident." *Johnson v. McCarver*, 942 F.3d 405, 409 (8th Cir. 2019). "A right is clearly established only if the violation was beyond debate such that only a plainly incompetent officer or a knowing lawbreaker would engage in the alleged misconduct." *Id.* (quotation omitted). "The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "This inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

Whatever the merits of plaintiffs' First and Fourth Amendment claims, the behavior alleged of the defendants in this matter cannot be said to be obviously violative of a clearly established constitutional right. The question at issue in this matter is not whether individuals generally may possess media that is not rated or unrated by the MPAA. Instead, the question is whether the particular limitations placed upon civil detainees by MSOP officials concerning not rated or unrated media would survive review under a modified *Turner* analysis. No case law binding on this Court — indeed, no case law at all, so far as this Court can tell[8] — establishes that restrictions similar to those at issue in this matter are unlawful. Plaintiffs may demonstrate that the Policy is too broad to further legitimate therapeutic or institutional interests, but the specific restrictions contested by the plaintiffs are not so obviously unlawful that only a fool or a knave would

---

[8] In fact, a court of this District recently rejected a claim similar to that raised by plaintiffs in this matter, albeit on summary judgment. *See Stone*, 2019 WL 7546630, at *4-7. By contrast, plaintiffs do not cite any case for the proposition that restrictions on unrated or not rated media are unlawful in the civil-detention context.

have enforced them.  Accordingly, defendants are entitled in their individual capacities to qualified immunity on those claims.

### C. Conclusion

Plaintiffs' First and Fourth Amendment claims related to the Policy have been plausibly alleged, and it is recommended that those claims go forward against defendants in their official capacities insofar as plaintiffs seek prospective injunctive relief.  In all other respects, it is recommended that defendants' motion to dismiss be granted.

### RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY RECOMMENDED THAT:

1. Defendants' motion to dismiss [ECF No. 16] be GRANTED IN PART and DENIED IN PART as follows:

   a. Defendant Minnesota Department of Human Services be DISMISSED WITHOUT PREJUDICE on the basis of sovereign immunity.

   b. All claims for monetary relief and claims brought under the Minnesota constitution against defendants in their official capacities be DISMISSED WITHOUT PREJUDICE on the basis of sovereign immunity.

   c. The claims brought under the equal protection clause against defendants in their official capacities be DISMISSED WITH PREJUDICE.

    d.       The claims related to the discontinuation of cable television brought against defendants in their official capacities be DISMISSED WITH PREJUDICE.

    e.       All claims brought against the defendants in their individual capacities be DISMISSED WITH PREJUDICE.

    f.       The motion to dismiss be DENIED with respect to the First and Fourth Amendment claims for prospective injunctive relief brought against defendants in their official capacities insofar as those claims relate to Minnesota Sex Offender Program Policy 420-5230.

2.      Plaintiffs' motion in opposition [ECF No. 24] is DENIED AS MOOT.

Dated: May__29___, 2020

                       *s/ Tony N. Leung*
                       Tony N. Leung
                       United States Magistrate Judge
                       District of Minnesota

                       *Jannetta et al. v. Minnesota Department of Human Services et al.*
                       Case No. 19-CV-2622 (ECT/TNL)

## <u>NOTICE</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).